UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
RAMON RIVERA,

                Plaintiff,                                NOT FOR PUBLICATION
                                                **MEMORANDUM AND ORDER**
    -against-                                    09-CV-4672 (CBA)(JMA)

ARCTIC OCEAN SHIPPING LTD. and
TRIREME VESSEL MANAGEMENT NV,

                Defendants.
------------------------------------------------------------x
ARCTIC OCEAN SHIPPING LTD. and
TRIREME VESSEL MANAGEMENT NV.,

                Third-Party Plaintiffs,

    -against-

GOLTENS-NEW YORK CORP.,

                Third-Party Defendant.
------------------------------------------------------------x
**AMON, Chief United States District Judge**

## INTRODUCTION

Plaintiff Ramon Rivera was injured at sea onboard the vessel M/V Arctic Ocean ("Arctic Ocean"). Plaintiff commenced this action on September 10, 2009 in Supreme Court, Kings County, alleging four causes of action: (1) negligence and unseaworthiness under the Jones Act; (2) unseaworthiness of the vessel under <u>Seas Shipping Co. v. Sieracki</u>, 328 U.S. 85 (1946); (3) breach of the duty recognized in <u>Kermarec v. Compagnie Generale Transatlantique</u>, 358 U.S. 625 (1958); and (4) negligence under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq*. ("LHWCA"). Defendants Arctic Ocean Shipping, Ltd. ("Arctic Ocean Shipping") and Trireme Vessel Management ("Trireme") moved for summary judgment against these claims. In his opposition, Rivera withdrew his second and third claims. Pl. Opp. at 2.

1

Defendants have also filed a third-party complaint seeking indemnity and contribution against Goltens-New York, Corp. ("Goltens"), Rivera's employer at the time of the accident. Goltens has also moved for summary judgment.

For the reasons stated below, defendants' motion is granted in part and denied in part, and third-party defendant's motion is granted.

## BACKGROUND

The following facts, drawn from the parties' statements pursuant to Local Civil Rule 56.1, are undisputed except where noted.

### I.     *The Parties*

Plaintiff Ramon Rivera is a resident of Brooklyn, New York.  Since approximately 1975, he has been a ship mechanic for Goltens. At Goltens, Rivera's primary job responsibility was to overhaul and repair vessel engines.

Defendant Arctic Ocean Shipping is a Bahamian entity with its office and principal place of business in the Bahamas.  At all relevant times, Arctic Ocean Shipping owned the Arctic Ocean. Defendant TVM is a Belgian company with its office and sole place of business in Antwerp, Belgium.  TVM is the technical ship manager for the Arctic Ocean.

Third-party defendant Goltens is a New York corporation that provides maritime mechanical services.  Its principal place of business is 160 Van Brunt Street, Brooklyn, New York. TVM hired Goltens to repair the Arctic Ocean's auxiliary engine no. 2 ("AE2"), which powered the large refrigerators in which the produce carried by the Arctic Ocean was stored.  Goltens had reconditioned the Arctic Ocean's engine in the past.

### II.     *Rivera's Work and Injury Aboard the Arctic Ocean*

Initially, Goltens performed its work overhauling and repairing the AE2 in stages as the

vessel was at the Port of New York from February 23-26, April 1-4, and April 22-24 of 2009.

Def. 56.1 Stmt. ¶ 15.  Rivera assisted with the overhaul on each of those dates. Id. ¶¶ 14-16.

The engine overhaul was not completed by April 24, 2009, when the Arctic Ocean was set to

depart the port for Ecuador.  Rivera and two other Goltens employees, Dimitrious Tsaropoylos

and Juan Cadabal, departed on board the vessel to complete the job. Id. ¶ 17.  Cadabal was the

foreman, assigned to supervise and perform the overhaul and repairs to the AE2. Id. ¶ 24.  Also

aboard the Arctic Ocean was Aruns Ketlerjus, a TVM employee and technical superintendent.

The extent of Ketlerjus's supervisory responsibilities, the degree of his control over the Goltens

team, and his specific instructions to Rivera on the day of the injury are disputed. See id. ¶¶ 26,

33, 38; Pl. 56.1 Stmt. ¶¶ 26, 33, 38.  At the very least, "Ketlerjus occasionally came into the

engine room during each day to check in general on the progress of the overhaul and repairs."

Def. 56.1 Stmt. ¶ 40.

The accident occurred at around 4:00 p.m. on April 27, 2009, while the vessel was at sea in

the Gulf of Mexico approaching Panama.  The parties agree that the Vessel's deck log indicates a

"Sea-scale" reading of 5 (6-9 foot waves) and a "Wind Force" reading of 6 (strong breeze).  This

apparently caused the ship to roll. See Accident Report of Capt. Cesar Camacho, Buchsbaum

Decl. ex. 21; Dep. of Camacho, Keough Decl. ex. I. at 59.  The parties dispute whether such

conditions are safe for the work the Goltens crew was doing at the time, and whether Rivera and

Tsaropoylos complained that the conditions were unsafe. See Def. 56.1 Stmt. ¶¶ 54-58, 62; Pl.

56.1 Stmt. ¶ 54-58, 62.

The accident occurred while Rivera was attempting to lift a piston off of a piston rack and

move it to a position above the AE2 for installation. Pl. 56.1 Stmt. ¶ 141.  According to Rivera's

deposition testimony, he was working alone. Pl. 56.1 Stmt. ¶ 69.  He alleges that Ketlerjus

ordered him to put the piston onto a small cart to bring it to the AE2. Id. ¶ 153-54.  He used a

chain block to lift the piston from a piston storage rack, then lowered the piston onto the cart. Id.

¶ 151.  After he got the cart over to the AE2, he attempted to lift the piston up onto another chain

block so that he could get it up to a track, from which it would be lowered into the AE2. Dep. of

Rivera at 86.  He was unable to do so, at which point the ship rolled, causing the cart to move

and both the cart and piston to strike him, injuring his left knee. Pl. 56.1 Stmt. ¶ 162.  Rivera

states that he had no time to chock or brace the cart before he was injured.  Id. ¶ 163.

Defendants' version of the events differs.   They claim that Rivera was working with

Tsaropoylos, Def. 56.1 Stmt. ¶ 70, and that Ketlerjus never ordered Rivera to use the cart, O/A

Tr. at 13.  According to defendants, Rivera and Tsaropoylos lifted the piston out of the rack with

the chain block above the cart, placed the piston on the cart, moved the piston to above the AE2,

and then realized while attempting to attach the chain block in that position that its hook would

not fit the eyebolt attached to the piston. Def. 56.1 Stmt. ¶ 70-71.  While Tsaropoylos went

looking for a shackle—which would be attached to the eyebolt and provide a wider opening for

the chain block's hook—the cart and piston moved, injuring Rivera's knee. Id. ¶ 71.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Belfi v. Prendergast,

191 F.3d 129, 135 (2d Cir. 1999).  The Court's function is not to resolve disputed issues of fact,

but only to determine whether there is a genuine issue to be tried.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).

Although the court is required to view the evidence in the light most favorable to the nonmoving party, see Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), the non-moving party cannot rest on mere allegations or denials but must instead set forth specific facts showing there is a genuine issue for trial, Fed. R. Civ. P. 56(e); Nat'l Westminster Bank USA v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("[S]peculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."). No genuine issue exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-50 (citations omitted).

## II.    *Jones Act Claim*

Rivera's first claim arises under the Jones Act. Section 30104 of the Jones Act provides, in pertinent part, that "A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. Defendants, joined by Third-Party Defendant Goltens, argue that Rivera is not a "seaman" under the Jones Act. Defendants further argue that they are not Rivera's "employer" under the Jones Act.

In order to be a "seaman" under the Jones Act, (1) "an employee's duties must contribut[e] to the function of the vessel or to the accomplishment of its mission," and (2) the employee "must have a connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature." Chandris, Inc. v. Latsis, 515 U.S. 347, 368 (1995) (internal quotation marks omitted). The Supreme Court has described this test as a "status-based standard." *Id.* at 364. The Court has explained that "the fundamental purpose of this substantial connection

requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.* Although "[t]he seaman inquiry is a mixed question of law and fact, and it will often be inappropriate to take the question from the jury . . . summary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 554 (1997)

Rivera satisfies the first component of the Chandris inquiry because his work on the AE2 "contributed to the . . . accomplishment of [the Arctic Ocean's] mission." The Arctic Ocean's mission was to transport bananas. Rivera was hired to fix the engine that powers the refrigerator that stores those bananas. The case law reveals that this requirement is a liberal one, see Mahramas v. American Export Isbrandtsen Lines, Inc., 475 F.2d 165, 170 (2d Cir. 1973) (collecting cases), and Rivera easily satisfies it.

Rivera's claim falters, however, on the second component of the Chandris standard because he lacks a substantial temporal connection to a vessel in navigation. In determining the adequacy of a plaintiff's temporal connection, the Supreme Court has adopted a rule of thumb developed in the Fifth Circuit that "a worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." Chandris, 515 U.S. at 371; see Solugub v. City of New York, 202 F.3d 175, 180-81 (2d Cir. 2000) (applying 30 percent rule). Accordingly, as the Fifth Circuit has put it, "[a] worker who aspires to seaman status must show that at least 30 percent of his time was spent on vessels, every one of which was under his defendant-employer's common ownership or control." Roberts

6

v. Cardinal Servs., Inc., 266 F.3d 368, 376-77 (5th Cir. 2001); see id. ("[A]s a general rule, [a] plaintiff must show . . . that 30 percent or more of his time is spent in service of that vessel."); see also Willis v. Fugro Chance, Inc., 278 F. App'x 443, 446-47 (5th Cir. 2008);  St. Romain v. Indus. Fabrication and Repair Serv., Inc., 203 F.3d 376, 379-80 (5th Cir. 2000); Buras v. Commercial Testing & Eng'g Co., 736 F.2d 307, 311 (5th Cir. 1984).   Rivera spent only 91 hours, or less than 5 percent of his work time, on the Arctic Ocean in the year preceding his injury. Def. Mot. at 9-10.  That percentage is far below the guidepost in Chandris, and only by zooming in to a tight snapshot of Rivera's early-2009 work time does the figure begin to approach the 30 percent threshold.  Indeed, although he initially contested the point in his papers, his counsel conceded at oral argument that as a proportion of his total work time, the percentage of his time aboard the Arctic Ocean is well below the 30 percent threshold. Def. Mot. at 9.

Rivera instead attempts to invoke language in Chandris recognizing that "[w]hen a maritime worker's basic assignment changes, his seaman status may change as well." Chandris, 515 U.S. at 372.  He claims that his basic assignment changed when the Arctic Ocean left port with him aboard.  This exception for a changed basic assignment recognizes the inherent unfairness in denying seaman status to a maritime worker injured at the very beginning of a sea-based assignment, for example, a "situation[] in which someone who had worked for years in an employer's shoreside headquarters is . . . reassigned to a ship in a classic seaman's job that involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the function of the vessel." Id.  But it does not, as Rivera seems to argue, mean that a maritime worker becomes a seaman every time he is exposed to the perils of the sea.  Indeed, the Chandris Court flatly rejected the notion that "seaman status is [] coextensive with seamen's risks," Chandris, 515 U.S. at 361, specifically rejecting a "voyage test" for seaman status, id. at 358.

Rivera was brought on board the Arctic Ocean for a discrete purpose—to overhaul the vessel's auxiliary engine—and limited time—he was set to leave it as soon as that job was completed.  There is nothing to suggest that Rivera was a newly-assigned permanent employee such that his percentage of work time aboard the Arctic Ocean would go up over some indefinite period of employment.  A reasonable juror therefore could not conclude that Rivera's "basic assignment" changed such that his connection to the Arctic Ocean was no longer a "transitory or sporadic" one.  To hold otherwise would be to conflate seamen's status with seamen's risks.

In sum, even if the facts are reviewed in the light most favorable to Rivera, as they must be on this motion, Rivera was a member of the local workforce whose duties "place[d] him aboard a large number of randomly-owned and controlled vessels for short periods of time," *Willis*, 278 F. App'x at 447 (quoting Buras, 736 F.2d at 311).  He was not "a member of the vessel's crew" who "owed his allegiance" to the Arctic Ocean, but rather "a land-based employee who happen[ed] to be working on the vessel at a given time." Chandris, 515 U.S. at 370.  He is thus not a seaman and summary judgment is granted on his Jones Act claim. See Chandris, 515 U.S. at 369-71 (where "undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may . . . grant[] summary judgment").

Defendants acknowledged at oral argument, to the agreement of all parties, that if Rivera is not a seaman—and therefore has no claim under the Jones Act—"that would end the third party action" as well. O/A Tr. at 3.  Accordingly, third-party defendant Goltens's motion for summary judgment against defendants is granted in its entirety. See Scindia, 451 U.S. at 165 (explaining that Section 905(b) abolished "the [employing] stevedore's obligation to indemnify the ship owner if the latter was held liable to the longshoreman").

III.     *Longshore and Harbor Workers' Compensation Act*

Because Rivera has no claim under the Jones Act, his only claim arises under § 905(b) of the

Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b).  Section

905(b) provides in pertinent part:

> In the event of injury to a person covered under this chapter caused by the
> negligence of a vessel, then such person . . . may bring an action against such
> vessel as a third party . . . . If such person was employed by the vessel to provide
> stevedoring services, no such action shall be permitted if the injury was caused by
> the negligence of persons engaged in providing stevedoring services to the vessel.

It is undisputed that Rivera is a "person covered" under the LHWCA.

The LHWCA does not define "negligence" for the purpose of actions against third-party

vessel owners under § 905(b), but the Supreme Court has held that "accepted principles of tort

law" apply in LHWCA actions, Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156,

165-66 (1981).  As in all negligence actions, the plaintiff must establish the elements of duty,

breach, causation, and damage. Trueba v. Glota Bananera Ecuadorian Lines, Inc., 675

F. Supp. 786 (S.D.N.Y. 1987).

*A.  Duty*

The Supreme Court articulated the duties owed by a shipowner to a longshoremen in Scindia,

and later refined these "Scindia duties" in Howlett v. Birkdale Shipping Co., 512 U.S. 92, 97

(1994).[1]  The Scindia duties are (1) the "turnover duty"; (2) the "active control duty"; and (3) the

"duty to intervene."  Rivera does not allege breach of the turnover duty, Pl. Opp. at 27 n.19, but

does contend defendants triggered both the active control duty and the duty to intervene.

With respect to the "active control duty," "once stevedoring operations have begun, the

---

[1] Although Scindia and much of its progeny address "the triangular relationship of vessel, independent stevedore
employer, and longshoremen employee," Gravatt v. City of New York, 226 F.3d 108, 121 (2d Cir. 2000), it is well-
established that the same general analysis applicable to "stevedores" and "longshoremen" applies to all workers
covered by the LHWCA, id. at 122.

vessel will be liable 'if it actively involves itself in [the] operations and negligently injures a longshoreman,'" or if the owner acts negligently with respect to hazards "'in areas, or from equipment, under the active control of the vessel during the stevedoring operation.'" Gravatt, 226 F.3d at 121 (quoting Scindia, 451 U.S. at 167).  "A jury may find that the vessel exercised control or took charge over an area either because it never turned exclusive control of the area over to the stevedore but retained substantial control, or because the vessel substantially interfered, by invitation or otherwise, with the stevedore's exercise of exclusive control, such as by actively intervening in the area." Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 541 (3d Cir. 1994).

The duty to intervene recognizes that "with respect to obvious dangers in areas under the principal control of the stevedore, the vessel owner . . . must intervene if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable care to protect its employees from that risk." O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 65 (2d Cir. 2002)

Rivera claims that Ketlerjus, an employee of defendants, ordered him to move the piston in an unreasonably dangerous manner. Pl. Opp. at 27.  As support for this theory, Rivera relies on the Second Circuit case O'Hara v. Weeks Marine, Inc., 294 F.3d 55 (2d Cir. 2002).  In O'Hara, evidence in the record suggested that the crane ordinarily used to lift heavy steel forms was broken. Id. at 66.  One of the defendant's employees, who was supervising the project, allegedly ordered the plaintiff to move them by hand, even though no other employees were available to assist. Id.

The Court concluded that this triggered both the duty to intervene and the active control duty. As to the duty to intervene, the court held that a reasonable jury could find that the manner in

which the plaintiff moved the steel forms was unreasonably dangerous; that the defendants'

employee ordered the plaintiff to move them in this manner; that the defendants' employee

therefore knew or should of known that he had ordered the plaintiff to move the forms in an

unreasonable manner; that no other employee was available to assist; and that the defendants'

employee therefore knew or should have known of the absence of any other employee who could

have prevented the accident by exercise of due care. Id.

With respect to the active control duty, the court held that "[v]iewed in the light most

favorable to O'Hara, the evidence could support a finding that [defendant's employee], who had

been actively supervising the barge's salvaging operation . . . knew of the risks posed by that

operation, but negligently ordered [the plaintiff] to lift the [steel] forms nonetheless." Id.

O'Hara is directly on point, and defendants have done very little to distinguish it. See Def.

Reply at 38.  Rivera testified that he had no help moving the piston because "the superintendent

[Ketlerjus] didn't want [Tsaropoylos] to help me. He said no, go someplace else to do something

else. He could do it by himself." Dep. of Rivera at 88-89.  He also testified that the ship was

rolling heavily at the time, id. at 108, a claim supported by the vessel captain's injury report, see

Accident Report of Capt. Cesar Camacho, Buchsbaum Decl. ex. 21, and that he complained to

Ketlerjus and the chief engineer on board regarding the safety of working in such sea conditions.

Id. at 41-42, 50-53, 108.

According to Rivera, Ketlerjus instructed him to use a cart to move the piston. Id. at 105.

Although the parties dispute whether it was technically feasible, neither party appears to dispute

that the safest, albeit less expeditious, way to move the piston would have been to rig at least two

chain blocks. Def. Mot. at 30 (arguing that Rivera and Tsaropoylos both knew that using the cart

was less safe than using the chain block system); Arnott Report, Def. Mot. exh.V, at 7-8; Pl.

Opp. at 279 (arguing that configuration of engine room prevented rigging of another chain block, which would have been safer).  Rivera claims that moving the piston with the cart was all the more dangerous because the wheels of the cart were rusty and the cart had no brakes.  He allegedly complained about this to Ketlerjus but was told to use it anyway. Id. at 105.

Defendants dispute Rivera's account, calling it "muddled, contradictory, and refuted by other fact witnesses." Def. Mot. at 34.  They argue that the active control duty was not triggered because Ketlerjus had no power to order Rivera to use the cart instead of the chain block system.  In support, they point out Cadabal's testimony that he gave the final orders, Ketlerjus's testimony that Cadabal was the boss, and Rivera's comment that he always followed Cadabal's instructions. Id. at 35.  Accordingly, they argue, Ketlerjus could not have been "actively involved."  As to the duty to intervene, they argue that there is no evidence that Ketlerjus (or anyone else) was aware of the dangerous manner in which Rivera was moving the piston.

These arguments ignore the standard on summary judgment.  The Court is obligated to view the evidence in the light most favorable to Rivera and draw all inferences in his favor. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  A jury could find, on the evidence in the record, that Ketlerjus instructed Rivera to use the cart to move the piston; that using a cart instead of two chain blocks was unreasonably dangerous, particularly in light of the alleged rolling of the ship and condition of the cart;[2] that Ketlerjus, as a marine superintendent, knew or should have known this; that, because it was Ketlerjus himself who gave the instruction, and because Rivera complained about his order, Ketlerjus was aware of the dangerous condition; and that Ketlerjus had ordered Tsaropoylos to work elsewhere and therefore knew that no Goltens employee could

---

[2] In their reply brief, defendants attack the competence and opinions of Rivera's purported expert, Charles Munsch. Because the argument was not advanced until defendants' reply, Rivera has not had an opportunity to respond. Even assuming Munsch's report is inadmissible, however, there is enough evidence in the record for Rivera to survive summary judgment.  A jury does not need an expert's help to determine whether the use of a cart with rusty wheels and no brakes on a rolling ship poses an unreasonable danger.

have exercised due care to mitigate the hazard.  As in O'Hara, this is sufficient to establish at the summary judgment stage both the "active control duty" and the "duty to intervene." See also Lubrano v. Royal Netherlands Steamship Company, 572 F.2d 2364 (2d Cir. 1978).

### B. Negligence

To the extent Defendants seek summary judgment on the issue of negligence, that question is generally for the jury. Taliercio v. Compania Empressa Lineas Argentina, 761 F.2d 126, 128 (2d Cir. 1985) ("The question of whether or not a shipowner acted negligently is a question of fact."); Lieggi v. Maritime Co. of Phillipines, 667 F.2d 324, 328 (2d Cir. 1981); McDuffie v. Conagra, Inc., 1996 WL 679827, at *4 (N.D.N.Y. 1996) ("Once the facts establish that a duty was owed by the shipowner to the longshoreman, the question of the shipowner's negligence is for the jury to decide.").  Summary judgment on this basis is denied.

### C. Causation

Defendants also asserted in their reply brief that Rivera cannot establish that the allegedly defective cart was a proximate cause of his injury.  Although the contours of this argument were not entirely clear in their briefing, they clarified their position at oral argument. O/A Tr. at 12-14. "The accident was caused at its core by the plaintiff and Tsaropoylos not using a shackle to first secure the piston when they were lifting it." Id. at 13.  This, they argue, was the reason Tsaropoylos went in search of a shackle, which was the reason Rivera was left to tend the piston alone, resulting in his injury.  Accordingly, they argue, even if Ketlerjus gave the order to use the cart, and even if that procedure was unreasonably dangerous, they cannot be held liable because the cart itself was blameless.

This argument is not persuasive.  To begin with, it again ignores the summary judgment standard in its characterization of Rivera's testimony.  Rivera alleges that he was working alone

with a cart on Ketlerjus's orders. Dep. of Rivera at 77-79, 88-89, 105.  He alleges that the cart's

wheels were rusty and that it had no brakes, and that he complained to Ketlerjus about this

condition. Id. at 105.  He managed to the get the cart in position, but the ship rolled, causing the

cart to move and eventually the piston to tip over and strike his knee. Id. at 118-120.  Defendants

have not argued, nor could they, that under this set of facts use of the cart was not a proximate

cause of Rivera's injury.

   And even if the cart itself was not the proximate cause of the injury, the cart is not the only

obvious risk precipitated by Ketlerjus's order.   As explained above, supra Section III.A,

defendants and Rivera both admit that the proper way to move the piston was with two chain

blocks at all times attached, a method defendants pointedly argue was a technical possibility.

The Court can only infer from this that moving a piston in the manner Rivera did carried with it

direct risks—a host of avoidable factors that could cause the mover to lose control of the piston,

causing it to fall—known to any, who like Ketlerjus, have some experience in a ship's engine

room.  Risk related to the cart itself, whether it was defective or not, is but one possibility.

Ketlerjus's alleged order brought a set of direct and foreseeable risks into play.  Rivera's injury

was a predictable incident of these increased risks.

   The two cases cited by defendants are not to the contrary.  In DeBiase, the court did, in the

context of discussing the "turnover duty," note the absence of evidence that the "twist lock"

involved in the accident was defective. DeBiase, 2009 WL 3077193, at *6.  But it also explained

that "the record lacks any evidence that it was unreasonable to expect that [plaintiff] himself

would understand that rusty twist locks would be encountered in the performance of his duties

and that rusty twist locks do not prevent a stevedore from safely carrying out the cargo

operations for which [plaintiff] was responsible." Id.  That is not so here.  In this case, both

parties have repeatedly argued that the method by which Rivera attempted to move the piston could very well prevent him from safely carrying out that task, and that any experienced mechanic would know this. The question in this case is whether Rivera (and perhaps Tsaropoylos) did so on their own, or whether he did so because Ketlerjus ordered him to.

Sinagra v. Atlantic Ocean Shipping, Ltd., 182 F. Supp. 2d 294 (E.D.N.Y. 2001), is also easily distinguishable. In Sinagra the court explicitly stated that "no member of the ship's crew gave any direction to or even communicated with" the independent contractor. Id. at 303. This distinguishes Sinagra from this case.

Defendants proximate cause argument does not entitle them to summary judgment.

### CONCLUSION

For the above reasons,

Third-party defendant Goltens's motion for summary judgment is GRANTED.

Defendants Arctic Ocean Shipping, Ltd. and Trireme Vessel Management's motion for summary judgment is GRANTED with respect to Rivera's Jones Act Claim and DENIED with respect to Rivera's LHWCA claim.

SO ORDERED.

Dated: Brooklyn, New York
       March 23, 2012

                                          _____/s/_____

                                          Carol Bagley Amon
                                          Chief United States District Judge

15